[No. B034090. Second Dist., Div. Three. June 26, 1989.]

FRANCES WILSON, as Special Administrator, etc., Plaintiff and Appellant, v.
RONALD STEELE et al., Defendants and Respondents.

**COUNSEL**

Burlison & Luostari and Walter R. Luostari for Plaintiff and Appellant.

Stephanie J. Sartoris and Robert S. Davis for Defendants and Respondents.

**OPINION**

**KLEIN, P. J.**—Plaintiff and appellant Frances Wilson (Wilson), special administrator for the estate of Millie C. Williams (decedent), appeals a judgment in favor of defendants and respondents Ronald Steele and Ken Steele (collectively, the Steeles).

The issue presented is whether a contractor's unlicensed status is a defect which may be asserted against the contractor's assignee who is a holder in due course.

We conclude: A contract by an unlicensed contractor is void and illegal. An unlicensed contractor's assignee, although a holder in due course, does not take a note and deed of trust related to such illegal contract free from the defense of "illegality of the transaction, as renders the obligation of the party a nullity[.]" (Cal. U. Com. Code, § 3305, subd. (2)(b).)

However, the trial court failed to make a factual finding as to whether the second loan transaction was related to construction work. If it were, the contractor's unlicensed status would preclude its assignee from enforcing the second note and second deed of trust. The judgment is therefore reversed and the matter remanded for further proceedings.

## FACTUAL & PROCEDURAL BACKGROUND

The subject real property was the sole asset of the estate of the decedent, who died in December 1985. The property is located on West 42nd Street in Los Angeles and comprises six dwelling units, four in the front and two in the rear. Naomi Williams (Williams), Wilson's sister, lived at 323 West 42nd Street with their mother, the decedent. Wilson lived with her children at 325½ West 42nd Street. In 1985, the property was valued at $120,000.

In 1979, Williams obtained a general power of attorney from the decedent. On August 12, 1983, Williams contracted with Michael Jackson & Associates, an unlicensed contractor, to refurbish the property. The cost of the job was to be $28,047. Williams obtained a $31,053 construction loan from Broadway Federal Savings and Loan Association (Broadway Federal) and executed a promissory note and first deed of trust on the property in favor of Broadway Federal.

Broadway Federal disbursed $31,053.80 to the escrow, which made $28,047 in progress payments to Michael Jackson & Associates and $3,006 to Williams.

The final payment to Michael Jackson & Associates was disbursed on December 7, 1983. The remodeling work, however, remained largely uncompleted. The same day, Williams obtained another loan and executed a second trust deed with power of sale, naming Home Budget Improvement Service (Home Budget), a Michael Jackson construction company, as trustee, and Shelia B. Jackson, Michael Jackson's (Jackson) daughter, as beneficiary. The second trust deed secured a promissory note in the sum of $11,064 to Home Budget, and purportedly was notarized by Jackson.

The Broadway Federal loan went into default.

The Steeles were in the business of purchasing foreclosed homes. They learned of the pending trustee's sale on the first trust deed through a newspaper ad, investigated the property title through the title company, and thereafter viewed the property. The Steeles then contacted Jackson to discuss acquiring the second trust deed. Jackson told Ronald Steele the consideration for the note was a cash loan to Williams. They agreed on a discounted price of $7,000, and Jackson assigned the note to the Steeles. Ronald Steele later assigned his interest in the note to his brother, Ken.

The default on the first loan was cured and the trustee's sale was cancelled.

On January 22, 1986, Wilson, as special administrator for the estate, filed suit against Williams, Shelia B. Jackson, Jackson, Michael Jackson & Associates, Home Budget, and the Steeles, for, inter alia, cancellation of a written instrument.

Wilson had not seen Williams since September 1984, and investigators failed to locate her or Jackson. The matter proceeded to trial only as to the Steeles.

The case was tried on January 11, 1988, to the court sitting without a jury. Wilson, her attorney, Walter Luostari, and the Steeles testified. At the conclusion of trial, the trial court observed: "It seems to me, though, that you have got a case where you have got a couple very sly and probably somewhat dishonest people, Naomi Williams and Michael Jackson, and on each side you have got some fairly innocent parties. And it's unfortunate that you, the honest people, are left to litigate this mess in court against each other when you really had very little to do with putting these events in motion."

The trial court granted judgment in favor of the Steeles and dissolved a preliminary injunction restraining the Steeles from foreclosing on the property. The statement of decision provided in substance: Pursuant to the power of attorney from her mother, Williams entered into a remodeling contract with Jackson and others. None was a licensed contractor. The work was never completed and all the money for construction was disbursed to Jackson and others. Broadway Federal, the holder of the first trust deed, commenced foreclosure. The Steeles became interested in purchasing the property from the trustee. In investigating title, the Steeles learned of the Jackson second trust deed and note, and entered into an arms length, good faith transaction to purchase the note and deed of trust at a customary discount. They paid adequate consideration and were not party to any of the Jackson activities. The note and trust deed were complete and regular on their face. The Steeles are holders in due course of a negotiable instrument and free of any defenses that the maker has against Jackson or the Steeles' transferor.[1]

Wilson appealed.

---

[1] Earlier, another judge issued a preliminary injunction restraining the Steeles from foreclosing, ruling: "The court has considered the opposing declarations of Ron and Ken Steele. In the court's opinion Ken Steele failed to make a diligent investigation, under the circumstances, to determine the validity of the note. Had he done so, he might reasonably have discovered its questioned validity."

CONTENTS

Wilson contends: (1) Home Budget's unlicensed status gives rise to an illegality defense which may be asserted against the Steeles; (2) the Steeles cannot be holders in due course because (a) they had notice the note was overdue, (b) the instruments were irregular on their face, and (c) they paid inadequate consideration.

The Steeles submit the judgment is supported by the evidence, as Wilson failed to show the promissory note and second trust deed were in any way connected to the construction on the property, and they paid value and were without notice.

DISCUSSION

1. *Contract by unlicensed contractor void and illegal.*

As indicated, the trial court found Home Budget was an unlicensed contractor.

Business and Professions Code section 7031 provides in relevant part: "No person engaged in the business or acting in the capacity of a contractor, may bring or maintain any action in any court of this state for the collection of compensation for the performance of any act or contract for which a license is required by this chapter without alleging and proving that he was a duly licensed contractor at all times during the performance of such act or contract, . . ." ▮ The severe sanction of the statute prevents enforcement of an illegal contract and protects the public from the perils incident to contracting with incompetent or untrustworthy contractors. (*Lewis & Queen v. N. M. Ball Sons* (1957) 48 Cal.2d 141, 152 [308 P.2d 713]; *Asdourian v. Araj* (1985) 38 Cal.3d 276, 282, 289 [211 Cal.Rptr. 703, 696 P.2d 95].)[2]

▮ "[W]hen the object of the statute or ordinance in requiring a license for the privilege of carrying on a certain business is to prevent improper persons from engaging in that particular business, or is for the purpose of regulating it for the protection of the public . . . , the imposition of the penalty amounts to a prohibition against doing the business without a license and a contract made by an unlicensed person in violation of the statute or ordinance is void." (*Wood v. Krepps* (1914) 168 Cal. 382, 386 [143

---

[2] The Steeles do not suggest that either Home Budget or Jackson came within the substantial compliance exception to the statute, which doctrine is discussed in *Knapp Development & Design v. Pal-Mal Properties, Ltd.* (1985) 173 Cal.App.3d 423, 431-432 [219 Cal.Rptr. 44].

P. 691]; accord *California Chicks, Inc.* v. *Viebrock* (1967) 254 Cal.App.2d 638, 641 [62 Cal.Rptr. 269]; see 1 Witkin, Summary of Cal. Law (9th ed. 1987) Contracts, §§ 491, 492, pp. 436-438.)

The question becomes whether a contractor's unlicensed status is a defense which may be asserted against a holder in due course.

California Uniform Commercial Code section 3302 defines a holder in due course as one who "takes the instrument [¶] (a) For value; and [¶] (b) In good faith; and [¶] (c) Without notice that it is overdue or has been dishonored or of any defense against or claim to it on the part of any person."

California Uniform Commercial Code section 3305 provides: "To the extent that a holder is a holder in due course he takes the instrument free from [¶] (1) All claims to it on the part of any person; and [¶] (2) All defenses of any party to the instrument with whom the holder has not dealt *except . . .* [¶] (b) . . . incapacity, or duress, or *illegality of the transaction, as renders the obligation of the party a nullity; . . .*" (Italics added.)

Paragraph 6 of the Uniform Commercial Code comment following section 3305 explains that if, under the local law, the effect of an illegality is to render the obligation entirely null and void, such defense may be asserted against a holder in due course. (23B West's Ann. Cal. U. Com. Code (1964) § 3305, par. 6, p. 215.)

■ Thus, because a contract by an unlicensed contractor is void and illegal pursuant to Business and Professions Code section 7031, the contractor's transferee would be subject to the illegality defense.[3]

---

[3] We are aware of *Walker* v. *Nitzberg* (1970) 13 Cal.App.3d 359, 367-369 [91 Cal.Rptr. 526], which held, inter alia, an assignee of an unlicensed contractor may recover by proving that at the time of the assignment the assignee was unaware of the contractor's unlicensed status. *Walker's result* is correct because it concluded the assignee failed to meet his burden of proof on the issue. (*Id.,* at pp. 368-369; see *Weeks* v. *Merritt Bldg. & Constr. Co.* (1974) 39 Cal.App.3d 520, 523 [114 Cal.Rptr. 209], criticized on other grounds in *Asdourian* v. *Araj, supra,* 38 Cal.3d at pp. 286-287.)

The *Walker* court's analysis was based on case law which predated the adoption of the California Uniform Commercial Code in 1963. (*Walker* v. *Nitzberg, supra,* at pp. 367-369; see *Appel* v. *Morford* (1943) 62 Cal.App.2d 36 [144 P.2d 95]; *C.I.T. Corp.* v. *Breckenridge* (1944) 63 Cal.App.2d 198 [146 P.2d 271]; *Shields* v. *Shoaff* (1953) 116 Cal.App.2d 306 [253 P.2d 1002]; *Benson* v. *Andrews* (1958) 166 Cal.App.2d 44 [332 P.2d 698].) California Uniform Commercial Code section 3305, subdivision (2)(b), is new statutory law (see code com., 23B West's Ann. Cal. U. Com. Code (1964 ed.) foll. § 3305, at par. 4, p. 213) which, as discussed *ante,* has the effect of attaching the disability of Business and Professions Code section 7031 to an unlicensed contractor's assignee, irrespective of the assignee's unawareness of the contractor's unlicensed status.

2. *California Uniform Commerical Code defenses apply to both the note and the deed of trust.*

Initially, the courts held a note secured by a mortgage was nonnegotiable. (*Helmer* v. *Parsons* (1912) 18 Cal.App. 450, 452 [123 P. 356]; *Kelly* v. *Universal Oil Supply Co.* (1924) 65 Cal.App. 493, 497 [224 P. 261].)

In 1923, former Civil Code section 3265 was amended expressly to remove security as an impediment to negotiability. (See Historical Note, 11 West's Ann. Civ. Code (1954 ed.) former § 3265, p. 716.) The amended statute provided: "A negotiable promissory note within the meaning of this title is an unconditional promise in writing made by one person to another, signed by the maker, engaging to pay on demand, or at a fixed or determinable future time, a sum certain in money to order or to bearer but the negotiability of a promissory note otherwise negotiable in form, secured by a mortgage or deed of trust upon real or personal property shall not be affected or abridged by reason of a statement therein that it is so secured, nor by reason of the fact that said instrument is so secured nor by any conditions contained in the mortgage or deed of trust securing the same. Where a note is drawn to the maker's own order it is not complete until indorsed by him." (Former Civ. Code, § 3265, 11 West's Ann. Civ. Code (1954 ed.) p. 715.)

*Hayward Lbr. & Inv. Co.* v. *Naslund* (1932) 125 Cal.App. 34, 40 [13 P.2d 775], considered the effect of this amendment on mortgages and deeds of trust, and concluded "since the amendment of 1923 to section 3265 of the Civil Code, the negotiable character of such a promissory note does impress a similar quality or characteristic upon the mortgage or trust deed which secures its payment. . . . 'While a mortgage does not of itself possess the quality of negotiability, yet, when given to secure a negotiable obligation, it will, by the weight of authority, so far partake of the character thereof that whenever the obligation is so transferred as to free it from all equities existing in favor of the maker of the note, prior indorsers, or third persons, the mortgage will also be freed therefrom.'"

A minority rule, followed in a few states, held that although the mortgage note is negotiable, the mortgage itself is only assignable in equity, and therefore, the assignee, having to resort to equity to enforce his rights, is compelled to do equity toward the mortgagor, and allow the mortgagor all defenses the mortgagor had against the mortgagee. (*Hayward Lbr. & Inv. Co.* v. *Naslund, supra,* 125 Cal.App. at pp. 40-41.)

*Hayward* reasoned that in view of the 1923 amendment to the statute, the majority doctrine should be adopted in California as the contrary doctrine

would greatly curtail the use of negotiable instruments and unduly restrict the purpose of said amendment. (*Hayward Lbr. & Inv. Co.* v. *Naslund, supra,* 125 Cal.App. at p. 41.) Thus, a holder in due course took both the note and deed of trust free of hidden defenses. (*Id.,* at p. 40; *Gribble* v. *Mauerhan* (1961) 188 Cal.App.2d 221, 225 [10 Cal.Rptr. 296]; Cal. Mortgage and Deed of Trust Practice (Cont.Ed.Bar 1979) § 2.20, p. 35.)

With the advent of the California Uniform Commercial Code, former title 15 of the Civil Code, Negotiable Instruments, comprising former sections 3082 to 3266d, was repealed by Statutes 1963, chapter 819, page 1997, section 2, effective January 1, 1965. The substance of former Civil Code section 3265 was continued in California Uniform Commercial Code section 3104, which broadly provides in relevant part: "(2) A writing which complies with the requirements of this section is [¶] . . . . [¶] (d) A 'note' if it is a promise other than a certificate of deposit." (Stats. 1963, ch. 819, § 3104; Cal. U. Com. Code, § 3104; see code com., 23B West's Ann. Cal. U. Com. Code (1964 ed.) foll. § 3104, at par. 6, p. 16; Cal. Mortgage and Deed of Trust Practice, *supra,* § 2.20, p. 34.) California Uniform Commercial Code section 3105, subdivision (1)(e), which provides a promise otherwise unconditional is not made conditional by a statement in it that it is secured, continues the principle of permitting a mortgage note to be negotiable. (Cal. Mortgage and Deed of Trust Practice, *supra,* at p. 34.)

█ Accordingly, we adhere to the *Hayward* rule that a deed of trust bears the same protections to the transferee and is also subject to the same commercial law defenses as the negotiable note which it secures.

To sum up, a contract by an unlicensed contractor is void and illegal, and both a note and deed of trust, if related to a construction contract by an unlicensed contractor, are subject to an illegality defense. It now remains to be determined whether the $11,064 note and second trust deed were in fact given for additional construction on the property. If this transaction were related to construction, Home Budget's unlicensed status will preclude the Steeles from enforcing the instruments.[4]

3. *Necessity for remand to determine applicability of illegality defense.*

█ The Steeles seek to resist the illegality defense on the ground there is no evidence the $11,064 note and second trust deed were for additional

---

[4] A contractor's entitlement to compensation under a contract is geared to the nature of the performance rather than the party's status. (*Executive Landscape Corp.* v. *San Vicente Country Villas IV Assn.* (1983) 145 Cal.App.3d 496, 500 [193 Cal.Rptr. 377].) The licensing prohibition only extends to contracts for which a license is required by the Contractors' State License Law. (Bus. & Prof. Code, §§ 7000, 7026, 7031.)

construction on the property. They urge this transaction was unrelated to any remodeling work and merely represented a cash loan from Home Budget to Williams, making the licensing defect irrelevant.

There was conflicting evidence on the issue of the purpose of the second loan.

Luostari, Wilson's attorney, testified: he, Luostari, asked Ronald Steele about his conversations with Michael Jackson regarding the purpose of the promissory note; Steele's reply to Luostari was that Jackson stated the note was for additional construction on the property.

Ronald Steele testified: at the time he purchased the note, Jackson told him the consideration for the note was a cash loan to Williams; after he purchased the note, Ken Bayer (the attorney who preceded Luostari) told him the consideration was for construction work.

The evidence that Bayer told Ronald Steele the loan was for additional construction does not establish the loan was in fact a construction loan.

The trial court's statement of decision did not make a finding as to the purpose of the subject loan. The trial court concluded the Steeles were holders in due course because they paid adequate consideration, were not parties to any of the Jackson activities, and entered into an arm's length, good faith transaction to purchase the instruments. However, the finding the Steeles were holders in due course does not dispose of the licensing/illegality defense.

To reiterate, California Uniform Commercial Code section 3305 provides "[t]o the extent that a holder is a holder in due course he takes the instrument free from [¶] . . . . [¶] (2) All defenses of any party to the instrument with whom the holder has not dealt except [¶] . . . . [¶] [inter alia] illegality of the transaction, as renders the obligation of the party a nullity; . . ." (Italics added.) In other words, a holder in due course takes free of all defenses except those enumerated in the statute. The finding that a transferee is a holder in due course is therefore not the end of the inquiry, but merely a threshold determination.

Here, the trial court failed to reach the essential remaining issue of whether, notwithstanding the Steeles' status as holders in due course, the illegality defense applied. For us to resolve the issue would be a usurpation of the trial court's function. Accordingly, the judgment must be reversed and the matter remanded for the trial court to make a finding as to the purpose of the subject loan. If the loan were for construction, the

licensing/illegality defense will bar the Steeles from enforcing the instruments, irrespective of their status as holders in due course. However, if the trial court finds a cash loan to Williams, Home Budget's unlicensed status will be unavailing to Wilson.

4. *Wilson's remaining contentions fail.*

a. *Unpaid interest did not put the Steeles on notice.*

■ Wilson contends the Steeles are not holders in due course because they took the note with notice it was overdue.

California Uniform Commercial Code section 3304 provides in relevant part: "(3) The purchaser has notice that an instrument is overdue if he has reason to know [¶] (a) That any part of the principal amount is overdue . . . [¶] . . . . [¶] (4) Knowledge of the following facts does not of itself give the purchaser notice of a defense or claim [¶] . . . . [¶] (f) That there has been default in payment of interest on the instrument . . . ."

The promissory note, dated December 7, 1983, was to mature September 1, 1986. On the sum of $11,064.48, the note called for payment of "principal and interest . . . in installments of [$131.72] or more" on the first day of each month, beginning January 1, 1984.

Ronald Steele testified: when he purchased the note in September 1985, he knew the payments on the loan had not been made; Jackson told Steele he had not collected the interest payments that were due on the note because "he was friends with the people and they didn't want to cause any problems . . . ."

Although the note called for payment of "principal and interest," in view of the 15 percent interest rate on the note, the required $131.72 payments would have gone entirely to interest, leaving nothing to reduce the principal amount. Accordingly, under California Uniform Commercial Code section 3304, subdivision (4)(f), the default in payment on the loan interest was insufficient to put the Steeles on notice of any defenses.

Wilson relies on language in *Bliss* v. *California Cooperative Producers* (1947) 30 Cal.2d 240, 245 [181 P.2d 369, 170 A.L.R. 1009], which stated a transferee is put on inquiry if he or she has notice of the fact that "the installments due *on the face of the instrument* have not been paid . . . ." (Italics added.) Wilson argues the fact the $131.72 installment payment may equal the interest payment is of no consequence because the payments due according to the face of the note were unpaid. *Bliss,* however, was based

on former Civil Code section 3133, subdivision (2), which was continued in California Uniform Commercial Code section 3304, subdivision (3)(a), set forth *ante*. California Uniform Commercial Code section 3304, subdivision (4)(f), providing that overdue *interest* does not prevent the holder from taking in due course, is new statutory law. (See 23B West's Ann. Cal. U. Com. Code, § 3304, Cal. Code com., pars. 6, 14, pp. 191, 193.)

b. *Disparity between note and deed of trust did not preclude holder in due course status.*

■ Although the payee on the note was Home Budget, the beneficiary of the deed of trust was Shelia B. Jackson, Jackson's daughter.

Wilson contends this disparity between the two instruments reflected infirmities to preclude the Steeles from attaining holder in due course status.

Because the irregularity did not apprise the Steeles of the licensing defect, but gave notice only of a claim or defense associated with the irregularity, the contention fails. (23B West's Ann. Cal. U. Com. Code, § 3304, code com., par. 3, pp. 190-191.)

c. *The Steeles took the note for value.*

■ Lastly, Wilson argues that because the Steeles paid only $7,000 for the $11,064 note, the purchase was not made in good faith and for value.

"While an offer to sell a secured note for two thirds its value is not itself sufficient to raise an inference that the instrument is tainted, it is a circumstance fairly to be considered in determining the question of a buyer's good faith. [Citations.]" (*Anderson* v. *Lee* (1951) 103 Cal.App.2d 24, 27 [228 P.2d 613].)

The consideration paid was adequate. (*Anderson, supra,* 103 Cal.App.2d at p. 27.) The trial court found the Steeles had acted in good faith. Because the finding is supported by substantial evidence (*Hasson* v. *Ford Motor Co.* (1977) 19 Cal.3d 530, 544 [138 Cal.Rptr. 705, 564 P.2d 857, 99 A.L.R.3d 158]), we reject the contention.

The Steeles' request for sanctions is denied.

### DISPOSITION

The judgment is reversed and the matter remanded for further proceedings consistent with this opinion.

Wilson to recover costs on appeal.

Arabian, J., and Croskey, J., concurred.